IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROY FRANKLIN HILLBERRY, II,

     Plaintiff,

v.                                       Civil Action No. 5:13cv113
                                       (Judge Stamp)

LT. R. ELDER; W.O. STEWART;
CORP. RETA MAYS; OFFICER
RICHARDS; OFFICER ADAMS;
OFFICER TIMOTHY ABNER;
OFFICER FREDERICK; COUNSELOR
JASON A. HUTSON, in their individual
capacities, and GEORGE TRENT;
JOHN V. LOPEZ, Chief of Operations;
and PAUL O'DELL, Deputy Director,
in their individual and official capacities,

     Defendants,

v.

LT. R. ELDER,

     Counter Claimant,

v.

ROY FRANKLIN HILLBERRY, II,

     Counter Defendant.

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* plaintiff, an inmate now incarcerated at the Mount Olive Correctional Complex ("MOCC") in Mt. Olive, West Virginia, initiated this case on August 15, 2013, by filing a Complaint for Injunctive and Declaratory Relief in the Southern District of West Virginia. The plaintiff paid the full $400.00 filing fee on August 20, 2013.

On August 21, 2013, the case was transferred to this district. (Dkt.# 6). The following day, it was construed as a civil rights complaint pursuant to 42 U.S.C. §1983 and docketed accordingly. On August 26, 2013, Clerk of Court issued a Notice of Deficient Pleading which advised the plaintiff that he must file his complaint on a court-approved form by September 16, 2013. On September 11, 2013, plaintiff filed his court-approved form complaint (Dkt.# 13).

On September 16, 2013, the undersigned conducted a preliminary review of the matter and determined that summary dismissal was not appropriate. Because the plaintiff had not sought leave to proceed *in forma pauperis*, he was not entitled to service by the United States Marshal. Therefore, an Order Regarding Preliminary Review and Service of Process was entered, advising him of the requirements of Rule 4(m) of the Federal Rules of Civil Procedure, and the Clerk of Court was directed to issue 21 days summonses for the defendants and forward those forms to the plaintiff (Dkt.# 14).

On September 26, 2013, the plaintiff filed a supplement to his complaint, attaching a Table of Contents and copies of the administrative remedies filed in connection with his claims (Dkt.# 18).

On October 8, 2013, the plaintiff sent a letter to the Clerk of Court, which was docketed as a letter motion for paid service of summons by the U.S. Marshals (Dkt.# 20). By Order entered October 16, 2013, plaintiff's letter motion was granted (Dkt.# 21).

On November 13, 2013, the defendants Abner, Richards, Adams, Elder, Hutson, Lopez, Mays, O'Dell, Stewart, and Trent filed an answer to the complaint (Dkt.# 26). On November 15, 2013, defendant Frederick filed an answer to the complaint (Dkt.# 27).

On December 18, 2013, a First Order and Notice Regarding Discovery and Scheduling was entered (Dkt.# 32). In that Order, the parties were directed to conduct discovery within 120 days of the date of the Order and to file all dispositive motions within 150 days of the Order.

Thereafter, written discovery was exchanged between the parties. Discovery on plaintiff's claims against the defendants closed on April 17, 2014.

On February 6, 2014, defendant Elder filed a Motion for Leave to File a Counter Claim (Dkt.# 37). On February 24, 2014, the plaintiff filed a Response in Opposition to defendant Elder's Motion for Leave to File a Counter Claim, titled Plaintiff's Answer and Opposition to Defendants [sic] Motion to [sic] Leave and [sic] File Cross Complaint [sic] (Dkt.# 54). On February 25, 2014, the undersigned issued a Report and Recommendation ("R&R") recommending that Elder's motion for leave to file a counter claim be denied (Dkt.# 56). Defendant Elder timely objected (Dkt.# 59). On March 31, 2014, plaintiff filed a Rebuttal and Objection to Defendant "Elder's" Objection to Report and Recommendation that Lt. R. Elder's Motion for Leave To File a Counter-Claim (Dkt.# 67). On April 7, 2014, defendant Elder filed a reply to plaintiff's Rebuttal and Objection (Dkt.# 70). By Memorandum Opinion and Order entered April 17, 2014, the District Judge declined to affirm and adopt the undersigned's February 25, 2014 R&R; sustained defendant Elder's objections; granted defendant Elder's Motion for Leave to File a Counterclaim; and directed the Clerk to file the proposed counter claim. (Dkt.# 76). The Counter Claim was filed that day (Dkt.# 77).[1]

On February 12, 2014, the plaintiff filed a motion to appoint counsel (Dkt.# 49). By Order entered February 19, 2014, the motion for appointed counsel was denied (Dkt.# 52).

---

[1] On May 12, 2014, plaintiff filed a Notice of Interlocutory Appeal of the April 17, 2014 Memorandum Opinion and Order granting defendant Elder's motion for leave to file the counter claim. Dkt.# 96. By Order of the Fourth Circuit Court of Appeals, the appeal was dismissed on plaintiff's motion on May 28, 2014. (Dkt.# 122).

On March 26, 2014, plaintiff filed a second Motion for Appointment of Counsel and Brief in Support (Dkt.# 64).

Also on March 26, 2014, plaintiff filed a Motion to Compel Defendants to Comply with Discovery Requests (Dkt.# 65). By Order entered March 28, 2014, the plaintiff's motion to compel was set for evidentiary hearing and argument (Dkt.# 66). On April 1, 2014, all defendants filed a response to plaintiff's motion to compel (Dkt.# 68). The evidentiary hearing on plaintiff's Motion to Compel was held on April 21, 2014; the *pro se* plaintiff appeared by telephone from the MOCC. (Dkt.# 80 and 86). By Order entered June 11, 2014, plaintiff's Motion to Compel was granted in part; defendants were ordered to respond to plaintiff's first request for production of documents with all requested information for the two-year period preceding the incident; in all other respects, plaintiff's motion was denied. (Dkt.# 126).

On April 18, 2014, the defendants filed a Motion for Leave to Depose Plaintiff. (Dkt.# 78). On April 21, 2014, the defendants filed a Notice of Cancellation of Plaintiff's Deposition. (Dkt.# 79). On April 30, 2014, the plaintiff filed a letter response in opposition to the defendants' motion for leave to depose him. (Dkt.# 87). By Order entered May 1, 2014, the defendants' motion for leave to depose the plaintiff was granted. (Dkt.# 90).

On April 24, 2014, plaintiff filed a Renewed Motion for Appointment of Counsel and Brief in Support (Dkt.# 84). By Order entered April 30, 2014, plaintiff's second and Renewed Motions for Appointed Counsel were denied. (Dkt.# 88).

On May 12, 2014, the defendants filed a proposed Order Regarding Discovery and Scheduling regarding defendant Elder's counter claim. (Dkt.# 93).

On May 15, 2014, the plaintiff filed a Motion and Brief for Extension of time to File Answer to defendant Elder's counter claim (Dkt.# 107). On May 19, 2014, plaintiff filed his

response to defendant Elder's counter claim, titled Plaintiff's Answer to Counterclaim filed by Defendant Lt. R. Elder (Dkt.# 112).

The defendants filed a First Motion for Summary Judgment on May 19, 2014 (Dkt.# 114). Because the plaintiff was proceeding *pro se,* on May 21, 2014, a Roseboro Notice was issued, advising him of his right to respond to the defendants' dispositive motion (Dkt.# 118).

The defendants filed a proposed Joint Proposed Order Regarding Discovery and Scheduling on Lt. Elder's counter claim on May 20, 2104 (Dkt.# 115).

By separate May 21, 2014 Orders, plaintiff's motion for an enlargement of time to respond to defendant Elder's counter claim was denied as moot (Dkt.# 116), and an Order on First Joint Proposed Order Regarding Discovery and Scheduling on Defendant Elder's Counter Claim was entered (Dkt.# 117).

Thereafter, written discovery was exchanged between the parties. Discovery on defendant/counter claimant Elder's claims against the plaintiff closed on July 31, 2014.

On June 16, 2014, plaintiff filed a memorandum in opposition to the defendants' Motion for Summary Judgment, titled Plaintiff's Brief in Response to Defendant's [sic] Motion for Summary Judgment (Dkt.# 127).

On June 18, 2014, the defendants filed Motion for Extension of Time to File Requested Documents (Dkt.# 129); it was granted by Order entered the following day (Dkt.# 130).

On July 16, 2014, the plaintiff filed a Motion Seeking Sanctions Against Defendants for Failure to Answer or Respond in Compliance with Court Ordered Production of Documents (Dkt.# 138). On July 18, 2014, the defendants filed a response (Dkt.# 140). Plaintiff replied on July 30, 2014 (Dkt.# 143).

On July 30, 2014, the plaintiff filed Motion to Dismiss Defendant Lt. R. Elder's Counter Claim (Dkt.# 142). On August 18, 2014, the defendant Elder filed his response (Dkt.# 152). On September 2, 2014, the plaintiff replied (Dkt.# 158).

Also on July 30, 2014, the plaintiff filed a Motion to Compel and Motion for Discovery, titled Motions to Compel Compliance with Court Ordered Discovery and Production of Documents and Motion to Extend Discovery (Dkt.# 144). By Order entered August 7, 2014, the motion to compel was set for evidentiary hearing and argument (Dkt.# 147). The evidentiary hearing took place on August 26, 2014; plaintiff appeared by telephone from the MOCC (Dkt.# 155 and 157). By Order entered August 27, 2014, the Pronounced Order of the Court Granting Plaintiff's Motion to Compel and Denying Plaintiff's Motion to Extend Discovery was confirmed (Dkt.# 156). Defendants filed objections on September 2, 2014 (Dkt.# 159). On September 15, 2014, the plaintiff filed a Rebuttal to Defendant's Objection to Order Granting Plaintiff's Motion to Compel and Denying Plaintiff's Motion to Extend Discovery (Dkt.# 165). By Order entered on September 26, 2014, defendants' narrowly tailored objections to correct a factual inaccuracy in the undersigned's Order were sustained (Dkt.# 190).

On July 31, 2014, the plaintiff gave a videotaped deposition at the MOCC (Dkt.# 200-1).

On August 1, 2014, plaintiff filed a Supplemental Response and Answers to Defendant's [sic] Motion for Summary Judgment (Dkt.# 146).

On August 8, 2014, the plaintiff filed a Motion for Temporary Transfer to Northern Correctional Facility (Dkt.# 148); by Order entered August 11, 2014, the motion was denied (Dkt.# 149).

On September 8, 2014, the plaintiff filed a Motion to Compel Production of all Video and Audio Recordings of May 10th and May 11th, 2012, Related to Any and All Incident's [sic]

Involving the Plaintiff and Defendant's [sic] (Dkt.# 162).  By Order entered September 10, 2014, the motion was set for an evidentiary hearing and argument (Dkt.# 163).  The evidentiary hearing was held on September 30, 2014; plaintiff appeared by telephone from the MOCC (Dkt.# 192 and 194).  By Order entered October 14, 2014, the Pronounced Order of the Court Denying in Part and Granting in Part Plaintiff's Motion to Compel[2] was confirmed (Dkt.# 196).

On November 6, 2014, plaintiff filed Motion to Compel for [sic] Production of Deposition Transcript (Dkt.# 197). The defendants responded on November 12, 2014. (Dkt.# 199). The defendants also filed a cover letter and a copy of the transcript at issue to the court the same day (Dkt.# 200). On December 1, 2014, the plaintiff replied.  (Dkt.# 201).

By Order entered December 10, 2014, the defendants were directed to provide the court with a copy of the surveillance videos for May 10 and 11, 2012. (Dkt.# 202).  On December 12, 2014, copies of the videos on DVD were hand-delivered to the court.

## II. <u>Contentions of the Parties</u>

### A. <u>The Complaint</u>

In his complaint, the plaintiff raises retaliation, excessive force, and supervisory claims against the defendants, who are all either employees of the North Central Regional Jail ("NCRJ") in Greenwood, West Virginia, or of the West Virginia Division of Corrections ("WV DOC"). Additionally, without providing argument in support, plaintiff's complaint also raises an implied claim of deliberate indifference to serious medical needs.

Plaintiff contends that between the months of January - June, 2012, he was repeatedly threatened by C.O. [Robert] Fredericks, Sgt. W.O. [Wesley] Stewart, and Lt. R.L. [Rodger] Elder. He asserts that on May 10, 2012, in a "premeditated assault" at the end of an

_____

[2] The motion to compel was granted in part as to the production by defendants of a suitable format for plaintiff to view three videos at issue.

administration segregation ("ad-seg") hearing, Lt. Elder "rushed" him and chest-bumped him,[3] initiating an assault by NCRJ correctional officers where he was beaten so severely that he had to be taken to the emergency room afterwards.

Plaintiff contends that the following day, May 11, 2012, defendant C.O. Frederick took him to the shower alone, in full restraints, stepped on his leg shackle chain, shoved him face-first to the floor, and then kicked and stomped his chest and abdomen so hard that he defecated involuntarily.[4]   Plaintiff contends that he requested medical care after this beating but was refused, other than an exam of his chest injuries.[5]

Plaintiff contends that he was threatened with further beatings if he reported the incidents, filed any grievances, or litigated the issue. He further asserts that the defendants have filed false, inconsistent and contradictory reports over the issue.  He avers that he has requested polygraph examinations be performed on himself and everyone involved, to prove his claims, but that his requests were denied.

Plaintiff contends he sustained injuries to his ribs, chest, wrist, ankle, heart, head, back and thumb, and that the defendants have failed to provide him adequate care for his injuries.

Plaintiff contends he has exhausted his administrative remedies and attaches copies of some grievances in support of this.[6]

As relief, the plaintiff seeks a trial by jury; compensatory damages for past, present and future medical expenses, for pain, suffering, loss of enjoyment of life, and mental/emotional

---

[3] Dkt.# 1 at 9 – 10.

[4] Dkt.# 1 at 20.

[5] Dkt.# 1-1 at 3.

[6] Plaintiff later filed a Supplement to his complaint, attaching copies of more administrative remedies and a Table of Contents of remedies he filed.  See Dkt.# 18.

distress; replacement of his glasses that were broken during the incident; punitive damages; and an award plaintiff all costs, reasonable attorney fees and litigation expenses. Plaintiff also seeks injunctive relief in the form of being immediately taken off of the "Q.O.L. program/Adseg and placed in the general population."[7] Further, he seeks a declaration that the defendants' actions and policies violated his civil rights; an Order enjoining the defendants from subjecting him to the "illegal and unconstitutional conditions, acts, omissions, policies and practices" alleged; and directing the defendants to develop and implement a plan to eliminate the "substantial risk of serious harm" from the defendants' excessive force and unsupervised actions and "to treat and properly medicate ALL injuries"[8] plaintiff sustained.

## B. Defendants' Answers to the Complaint (Dkt.# 26 and 27)

The defendants contend that plaintiff's complaint should be dismissed because

1) it fails to state a claim upon which relief can be granted;

2) plaintiff may have failed to fully exhaust his administrative remedies;

3) defendants are entitled to qualified immunity;

4) plaintiff's damages are not the direct and proximate result of any act of the defendants;

5) plaintiff may have failed to mitigate his damages;

6) plaintiff's alleged damages, if any, were caused by the plaintiff or others;

7) defendants assert the affirmative defenses of waiver, estoppel, laches and/or unclean hands;

8) any claim based upon *respondeat superior* should be dismissed;

9) defendants reserve the right to assert any and all other affirmative defenses that become apparent throughout the course of discovery; and

---

[7] Dkt.# 1 at 30.

[8] Dkt.# 1 at 32.

10) the defendants contend that after plaintiff exchanged words with defendant Elder, plaintiff assaulted Elder, resisted instructions of other corrections officer and was taken to the ground by them; plaintiff was sprayed with OC because of his continued resistance; arm barred; and placed in figure four lock restraints with pressure to his right axis. Defendants deny all of plaintiff's allegations of excessive force and retaliation and demand strict proof thereof.

## C. **Defendant Elder's Counter Claim (Dkt.# 77)**

Defendant/Counter-Claimant Elder contends that plaintiff was scheduled to attend the May 10, 2012 ad-seg hearing to address plaintiff's previous conduct at the jail. Lt. Elder was assigned to oversee the hearing. Shortly after it commenced, plaintiff began raising his voice and acting aggressively. Lt. Elder immediately terminated the meeting. When Elder attempted to exit the office, plaintiff struck Elder in the face and pushed him; Elder fell backwards out of the door of the office, striking his head on the concrete floor. Lt. Elder avers that he did not instigate or provoke the plaintiff in any way before plaintiff struck him.

Lt. Elder asserts the torts of intentional infliction of emotional distress, assault and battery against plaintiff.

## D. **Plaintiff's Answer to Defendant and Counter Claimant Elder (Dkt.# 112)**

Plaintiff asserts that Lt. Elder's counter claim should be dismissed because

1) it fails to state a claim upon which relief can be granted;

2) Elder's claim is not well grounded in fact or law, and was raised for the improper purpose to harass, delay, and/or multiply the proceedings, to intimidate plaintiff and overly burden him;

3) Elder's damages are "not the direct and approximate [sic] result of any act" of plaintiff;

4) Elder may have failed to mitigate his damages;

5) Elder's alleged damages, if any, were caused by Elder and not the plaintiff;

6) the plaintiff asserts the affirmative defenses of waiver, estoppel, laches and/or unclean hands;

7) the plaintiff reserves the right to assert any and all other affirmative defenses that become apparent through the course of discovery; and

8) plaintiff denies all of Lt. Elder's allegations about plaintiff assaulting Elder and the injuries Elder sustained; denies all of Lt. Elder's regarding his damages and requires strict proof thereof; and reiterates his claims against Elder.

## E. Defendants' First Motion for Summary Judgment (Dkt.# 114)

In their motion, the defendants argue that summary judgment should be granted in their favor because

1) plaintiff's supervisory claims against defendants Trent, O'Dell and Lopez should be dismissed as a matter of law because plaintiff has not alleged they were actually physically involved in the assault, and liability cannot be solely predicated on *respondeat superior*;

2) the evidence does not support plaintiff's claim that Elder assaulted him; rather, the evidence, including a West Virginia State Police investigation, indicates that plaintiff is the one who assaulted Elder; thus plaintiff's claim should be dismissed as a matter of law;

3) plaintiff has not produced sufficient evidence to support his allegation that defendants Stewart, Mays, Richards, Adams, Abner, Frederick and Hutson assaulted him, thus those claims should be dismissed as a matter of law;

4) plaintiff has not produced sufficient evidence to support his allegations regarding additional assaults on May 10 and 11, 2012 by C.O. Frederick and others, and thus those claims should be dismissed as a matter of law; and

5) plaintiff has produced no evidence to support his claims that he was denied medical treatment for his alleged injuries, thus they should be dismissed as a matter of law.

## F. Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Dkt.# 127)

Plaintiff reiterates his claims and attempts to refute the defendants' arguments on the same.

## G. Plaintiff/Counter Defendant Hillberry's Motion to Dismiss Defendant/Counterclaimant Elder's Counter Claim (Dkt.# 142)

Plaintiff/Counter Defendant Hillberry asserts that Elder's counterclaim should be dismissed, because newly discovered evidence acquired through discovery indicates that Elder

knowingly filed a false and frivolous counterclaim in violation of Fed.R.Civ.P. 11(a). In support, he argues that copies of Elder's medical records, received through discovery, show Elder was examined by his physician the day after the May 10, 2012 incident and had no injuries.

## H. Plaintiff's Supplemental Response and Answer to Defendants' Motion for Summary Judgment (Dkt.# 146)

Plaintiff provides a supplemental response and answer as to his supervisory claims against defendants Trent, O'Dell and Lopez, attaching numerous documents, some of which were obtained through discovery.

## I. Defendant/Counterclaimant Elder's Response to Plaintiff/Counter Defendant Hillberry's Motion to Dismiss (Dkt.# 152)

Defendant/Counter-Claimant Elder asserts that dismissal of Elder's counterclaims is inappropriate because there are clear questions of fact regarding them. Elder asserts that he has produced medical records from multiple providers documenting the injuries he received in the May 10, 2012 fall.

## I. Plaintiff/Counter Defendant Hillberry's Reply to Defendant/Counterclaimant Elder's Response (Dkt.# 158)

Plaintiff/Counter Defendant Hillberry reiterates his claims and attempts to refute Elder's arguments on the same. He contends that Elder's own medical records show that the injuries Elder now claims are a result of plaintiff's tortious activities are actually preexisting injuries that pre-date the May 10, 2012 fall.

## III. Standard of Review

## A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to

support his or her allegations. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct.1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. <u>Id</u>.; see also <u>Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc.</u>, 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id. Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters), Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) <u>Francis v. Giacomelli</u>, 588 F.3d 186 (4th Cir. 2009).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

**B. Motion for Summary Judgment**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts

showing the existence of a genuine issue for trial.  Id. This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## IV. Analysis

### A. Plaintiff's Claims Against the Supervisory Defendants: Administrator George Trent; Deputy Director Paul O'Dell; and Chief of Operations John V. Lopez

Liability under §1983 is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citation omitted). Therefore, in order to establish liability under § 1983, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a § 1983 case. Rizzo v. Good, 423 U.S. 362 (1976).

As a preliminary matter, state officials sued in their official capacities do not constitute "persons" within the language of 42 U.S.C. §1983. Official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation and quotations omitted). Therefore,

suits against state officials in their official capacities should be treated as suits against the state. Id. at 166.

In order for the governmental entity to be a proper party of interest, the entity's policy or custom must have played a part in the violation. Id. (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978)). Thus, it is possible that a governmental entity could be liable if it had a policy or custom of failing to train its employees, and that failure amounted to "deliberate indifference" causing the constitutional violation. See City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). Here, while the plaintiff fails to assert that any official policy played a part in the alleged violation of his constitutional rights, he does allege that the supervisory defendants had a *de facto* custom in place, by which they tacitly authorized the use of CO's abusive behavior by turning a blind eye toward it and refusing to discipline officers who engaged in it.

However, plaintiff's complaint also states that the supervisory defendants are being sued in their individual and personal capacities. State officials are considered "persons" within the meaning of §1983 when sued in their individual capacities, and as such may be held personally liable for damages. See Hafer v. Melo, 502 U.S. 21, 31 (1991). These claims do not require proof of any policy or custom of the entity that violated plaintiffs' rights, and qualified immunity may be raised as a defense.

As to supervisory capacity, there is no *respondeat superior* liability under §1983. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F. 2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge, *supra.* When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under

§1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F. 2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under §1983 if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), *cert. denied,* 513 U.S. 813 (1994).[9]

In this case, the plaintiff makes no specific allegations against Administrator George Trent ("Trent"); Deputy Director Paul O'Dell ("O'Dell"); or Chief of Operations John V. Lopez ("Lopez"), to indicate that they were *personally* involved in any violation of his constitutional rights. Rather, his complaint asserts that Trent, O'Dell, and Lopez "knew or should have known of the pervasive and widespread conduct" of the defendants in using "malicious and sadistic" force against him and other inmates like him. He contends their collective failure to properly investigate, train, supervise, acknowledge, address and discipline the defendants amounts to deliberate indifference or tacit authorization of unconstitutional force against inmates. The copies of grievances attached to his complaint allege that the supervisory defendants "approve and even order the beatings of inmates" and that assaults on inmates "are not rare, they are routine most

---

[9] "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Shaw, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id.

times daily events.[10]  In his response to the defendants' dispositive motion, plaintiff alleges that defendant Elder "and the majority of all other defendants have been involved in multiple assaults, and questionable use of force incidents on inmates at NCRJ in the past" and that excessive use of force by "subordinates" is a "pervasive, widespread . . . custom or practice."[11]

In support of his claim that the supervisory defendants routinely ignored other incidents of excessive force inflicted by COs, through discovery, plaintiff has attempted to prove that the supervisory defendants ignored or permitted such behavior by COs.  Pursuant to plaintiff's discovery requests, the defendants were required to produce copies of grievances and/or complaints involving other NCRJ inmates' allegations of excessive force, physical or sexual abuse, along with copies of the related investigations, for the two years preceding May 10, 2012; and the case numbers for any civil actions, naming any of the defendants in this action.

In an April 21, 2014 evidentiary hearing on plaintiff's March 26, 2014 motion to compel,[12] counsel for the defendants represented to the court that although there had been a total of 67 civil actions filed against the nine named defendants,[13] "[t]here happens to be no prior discipline for any of these defendants for use of force prior to this incident."[14]  Counsel for the

---

[10] Dkt.# 127-6 at 2 – 3.

[11] Dkt.# 127 at 18.

[12] In that motion, plaintiff sought production of copies of any grievances, complaints, or other documents received by the NCRJ or the West Virginia Regional Jail & Correctional Facility Authority ("WVRJCFA') regarding mistreatment, abuse, assault and sexual assault by any of the named defendants, along with any memoranda, investigative files or other documents created in response to such complaints, attaching a copy of the defendants' response, which objected on the grounds that gathering the requested documents would be overly burdensome.   See Dkt.# 65.

[13] Counsel for the defendants specified that the "vast majority of those  [lawsuits] are filed against Mr. Trent, who's the administrator, who, as you're aware . . . is named in many actions in administrative or supervisory capacity.  Mr. O'Dell, who is the commissioner, likewise named [sic] in several lawsuits in a supervisory capacity.  Same with Mr. Elder.  He was the lieutenant there, named in a supervisory capacity, same with Mr. Lopez." Dkt.# 86 at 14 – 15.

[14] Dkt.# 86 at 14.

defendants represented that the only CO named as a defendant in this case who had prior lawsuits filed against him was defendant W.O. Stewart, who had two cases filed against him; one was dismissed and the other was an excessive force case, which was settled.[15]  Plaintiff testified that the settled case involving defendant Stewart was an excessive force case involving the death of an inmate incarcerated at the NCRJ.[16]

A careful review of the defendants' production of all grievances and complaints regarding excessive force, physical and sexual abuse at the NCRJ for the two years preceding the May 10, 2012 incident alleged plaintiff's complaint establishes that the plaintiff has failed to substantiate any credible allegations supporting a finding that the elements necessary to establish supervisory liability are present against the supervisory defendants, let alone proven that inmate beatings are routinely "ordered" by the supervisory defendants and occur on a near-daily basis. To the contrary, the affidavits, copies of grievances, complaints, and investigations performed thereto, involving other inmates during the relevant two-year time period indicates that there were no credible or even any non-credible allegations of excessive force or abuse of any kind that were not investigated, and appropriate action taken against involved officers when indicated. Rather, in one excessive force report, after investigation substantiated an inmate's claim,[17] a C.O. was fired and two others received 5-day suspensions for their actions in the incident.[18]  In another, an officer received an 80-hour work suspension without pay for using unnecessary force

---

[15] Dkt.# 86 at 15 - 16.

[16] Dkt.# 86 at 15 – 16.

[17] That inmate alleged that he was struck in the back of the head and side of the face, by a C.O. wielding can of O.C. spray.  See Dkt.# 168 and 184.

[18] Dkt.# 168 and 184. In that investigation, emails between Administrator Trent and Lt. Elder revealed that both appeared incensed over the credible allegations of wrongdoing by the involved COs and immediately moved to begin investigating the incident.

against a non-resisting inmate, and then being untruthful in the investigation of the matter.[19] In another, after investigating an inmate's grievances regarding verbal "threats" from an officer, the CO involved was admonished and advised that his "comments were unnecessary and he should approach situations such as this in a more professional manner in the future."[20] Because the words spoken by that officer (not one of the named defendants) were merely "tough guy-type" boasting of physical abilities, and no actual threat was made nor any injury inflicted, the complaining inmate was advised that the issue was "a problem with communication not threats."[21]  In another, conflicting stories received from inmates and COs regarding an allegation that another officer had encouraged one inmate to "beat up" another were investigated and then forwarded to the Regional Jail Authority for review.[22]  Finally, in another incident regarding use of force after a fight between two female inmates, investigation determined that there was no inappropriate action or excessive force by any officer involved. However, because one of the inmates subsequently filed a grievance stating she was in fear for her own safety from two of the officers, she was moved to protective custody and her complaint was forwarded to the Regional Jail Investigator.[23]

_____

[19] Dkt.# 127-7 at 1 – 5.  In that June 1, 2011 incident, an officer responding to an "officer assistance" call observed the officer repeatedly hitting a non-resisting inmate's head against the floor. The limited record of the incident indicates that the apparent injury sustained by that inmate was "some swelling and a knot" on the left side of his face. Dkt.# 127-7 at 10.  The disciplined officer is the same officer who received a letter of commendation for reporting excessive force used by another C.O. against a different inmate in a January 27, 2011 incident.  See Dkt.# 168.

[20] Dkt.# 178.

[21] Dkt.# 178.

[22] Dkt.# 167, 173, and 181. In that instance, the accused officer had previously received a letter of commendation for reporting a later-substantiated, witnessed incident of excessive force referred to earlier, resulting in the firing of one C.O. and the 5-day suspension of two others.

[23] Dkt.# 176. One of those officers was C.O. [Mark] Richards, a named defendant in this action.

Further, while defendant Trent was named in his supervisory capacity in a long list of cases, the civil action numbers of which were provided by the defendants, the only two cases relating to any of the named defendant COs' employment at the NCRJ for the same time period[24] indicate that one case was dismissed as insufficiently pled, for failing to state a claim upon which relief could be granted, failure to prosecute, and as moot.[25] The other was settled.[26]

While it is apparent from a thorough review of the record before me that there have been instances of excessive force at NCRJ in the past, they appear to be very infrequent. Moreover, it appears that once reported, they are swiftly investigated, and contrary to defendants' counsel's

---

[24] The *pro se* law clerk assigned to this case has corroborated this information by a search of the docket for each defendant officer's name.

[25] Stuckey v. NCRJ, Civil Action No. 1:12cv137 (N.D. W.Va. 2012), filed against the NCRJ, Donna Kuroski; W.O. Stewart; George Trent; John Lopez; Paul O'Dell; and the West Virginia Regional Jail Authority, did not allege excessive force or any physical or sexual abuse, only interference with religious rights and conditions of confinement claims.

[26] Hoover v. Trent, Civil Action No. 1:07cv47 (N.D. W.Va. 2009), filed by Katherine A. Hoover, administrator of the Estate of Michael Tomasic, deceased, against George Trent; Roger Elder; Thomas McCray; Lisle Elder; Wesley Stewart; Timothy Scott Cain; and John and Jane Does 1-10, alleging alternatively that her son's death was caused by: 1) abuse by inmates with the knowledge of the jail guards; 2) abuse by guards; 3) arrival at the jail with injuries that the jail ignored; 4) being ignored and treated with deliberate indifference by the guards; and 5) being sent to the hospital without disclosure by the jail of what his injuries were and how he had received them, all in violation of duties owed him by the jail and its jailers, thereby depriving him of the opportunity to be effectively medically and proximately resulting in his death on October 7, 2005 without ever regaining full consciousness. See 1:07cv47, Dkt.# 80 at 1-2.

  It is apparent from the expert report of one Howard H. Painter ("Painter report") in the record of that case, that defendant W.O. [Wesley] Stewart was not even present during the time that the assault at issue in that case occurred, sometime between 11:50 p.m. on September 29, 2005 and the morning of September 30, 2005. Stewart did not come on duty as Booking Officer until 8:00 a.m. on September 30, 2005; Tomasic was discovered approximately twenty-five minutes later, already seriously hypothermic and *in extremis* from blunt force injuries to his head, neck, chest, ribs, and abdomen from an apparent assault, lying in clothing wet from his own vomit and incontinence on a concrete floor. See 1:07cv47, Dkt.# 202-2 and 205-2.

  The record of that case indicates Tomasic was obviously seriously mentally ill on admission, but despite that, was misclassified, not put in a single-occupancy cell as required, but in a multiple-occupancy cell with other inmates. He was given a shower and uniform, but in violation of the rules, no blanket or mattress; further, records of what was issued to him were falsified. Although advised by Tomasic's family that he was "violent and manic depressive," he was only placed on 30-minute watches, not the 15-minute observations required for an obviously mentally ill inmate. Further, the 30-minute watches, although documented as done, were *not* done by the COs on duty for hours, and the records of them were falsified, as, apparently, were many other records made by the COs working that night. See 1:07cv47, Dkt.# 40 at 1 – 4.

  The only allegation of wrongdoing by Lt. Elder mentioned in the Painter report was his failure, along with that of another named defendant, to provide a copy of Tomasic's medical records to emergency medical personnel when he was being transported to the hospital. See 1:07cv47, Dkt.# 202-2 at 8.

statement at the April 21, 2014 evidentiary hearing that "[t]here happens to be no prior discipline for any of these defendants for use of force prior to this incident," officers who are found to be at fault are indeed disciplined, and/or even fired.

There is nothing in the record to substantiate plaintiff's claims that that any of the supervisory defendants ever "ordered" that he or any other inmate "be beaten," that beatings occurred nearly daily, or that the supervisory defendants were deliberately indifferent to, or tacitly authorized abusive behavior on the part of their subordinates.[27] Moreover, it is apparent from a review of the available record that every time a supervisory defendant received actual or constructive knowledge that a subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to inmates like the plaintiff, the incident was immediately investigated. Consequently, the plaintiff fails to state a claim against Trent, O'Dell and Lopez in either their individual or official capacities. Because this claim appears to have been made in bad faith, it should be dismissed as frivolous and malicious as well.

**B. Plaintiff's Excessive Force Claims Against Defendant Lt. R.L. Elder**

To comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). However, while courts should give deference to a prison official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 321-22 (1986). For a plaintiff to prove a claim of excessive force, he must first demonstrate that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Hudson v. McMillian, 503

---

[27] Shaw v. Stroud, 13 F.3d at 799.

U.S. 1, 8 (1992) (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298, 303 (1991)). Second, he must show that prison officials inflicted unnecessary and wanton pain and suffering. <u>Id</u>. at 6.

With regard to prison disturbances, whether unnecessary and wanton pain and suffering was inflicted "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley</u>, 475 U.S. at 320-21. To determine whether an official acted maliciously and sadistically, the following factors should be balanced: (1) "the need for application of force;" (2) "the relationship between the need and the amount of force that was used;" (3) "the extent of the injury;" (4) "the threat reasonably perceived by the responsible official;" and (5) "any efforts made to temper the severity of a forceful response." <u>Id</u>. at 321; <u>Williams v. Benjamin</u>, 77 F.3d 756, 762 (4th Cir. 1996). The Supreme Court has made it clear that the core judicial inquiry in an excessive force claim is not "whether a certain quantum of injury was sustained, but rather, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010) (citation and internal quotation marks omitted). Instead, the extent of injury is one factor to consider, but it "does not end [the analysis]." <u>Hudson</u>, 503 U.S. at 7.

Here, plaintiff contends that on May 10, 2012, while he was being escorted out of an administration segregation hearing at the NCRJ, in a "premeditated assault," defendant/counterclaimant Lt. R.L. Elder ("Elder") jumped out of his chair, ran across the room and chest-bumped him, knocking him into a wall, then attempted to punch him in the face. Plaintiff contends that he raised his arms to block Elder's punch by pushing Elder away,[28]

---

[28] Dkt.# 1 at 10.

initiating an assault by guards, in which he did not resist, but was beaten so severely anyway, that he had to be taken to the emergency room afterwards for treatment.

Plaintiff contends that Elder did not hit his head when he shoved him away, and that Elder had no injury when he was examined afterwards by the nurse, other than a superficial scratch on the left side of his mouth.[29]

The defendants contend that plaintiff's claim has no merit and plaintiff was the aggressor, not Elder.

Here, Plaintiff's bald assertions notwithstanding, there is no evidence to suggest that Lt. Elder maliciously rushed at the plaintiff and started beating him without provocation. A careful review of the record reveals that plaintiff has produced no evidence or witness to support his claim that Lt. Elder was the aggressor.  To the contrary, a review of the materials supplied by both the plaintiff and the defendants clearly support Elder's version of the altercation.  Every person who witnessed any portion of the altercation averred that plaintiff was the aggressor who struck Lt. Elder first while Elder was attempting to open the door of the hearing room, after plaintiff became argumentative and aggressive and was being escorted out;[30] plaintiff vigorously resisted the many officers who responded to the "officer assistance call" and tried to restrain him;"[31] and that the use of force was necessary to control plaintiff and maintain order.  Further, numerous witnesses saw Elder fall backwards and strike his head on the floor.

Accordingly, although subsequent use of force and O.C. spray were used to subdue plaintiff, such action was used only after plaintiff first struck Elder, then repeatedly failed to

---

[29] Dkt.# 1 at 24 – 25.

[30] Dkt.# 1-2 at 1, 5, 6-7, 10, 12 – 13, 17, 18, 19, and Dkt.# 1-3 at 1, 3 – 4.

[31] Dkt.# 1-2 at 1, 5, 7, 10, 11, 13, 14, 15 – 16, 17, 19 (". . .Mr. Hillberry grabbed my left wrist and pulled it under him and I felt that he was going to bite my hand."), and Dkt.# 1-3 at 1 and 4 ("She stated she has seen a lot of inmates have to be controlled by officers and this one was one of the worst . . . the inmate was very strong and the officers had a hard time getting his hands behind him to handcuff them.").

follow instruction and vigorously resisted being restrained. Further, except for some question in the record of whether the O.C. spray was used before and/or after plaintiff was fully restrained, the use of force was in compliance with protocol established by the WVRJCFA  Therefore, with respect to this incident, it is clear that the force used was applied in a good-faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm.

### C. Plaintiff's Claims Against COs [Mark] Richards, Timothy Abner, Frederick, and Adams; Sgt. W.O. Stewart; Cpl. Reta Mays; and Counselor Jason Hutson

Plaintiff's complaint contends that "[o]ver the course of two . . . days . . . [he] was sprayed with (OC) twice (back to back); arm bared [sic], placed in a figure four leg lock, pressure applied to his R-axis, wrists and ankles twisted and dislocated, chest stomped on, kicked, punched in his face and body, chest-bumped, elbowed & kneed, stomped and spat on."[32]

Specifically, plaintiff asserts that on May 10, 2012, after warding off Lt. Elder's punch by pushing Elder away, Sgt. W.O. Stewart ("Stewart") tackled him, took him to the floor, placed him in a "choke hold," "where a ten-minute long "vicious unjustified attack" by "numerous officers" took place. Plaintiff contends that he was fully restrained within the first two minutes, but that the beating went on for eight more minutes.[33]  The incident reports attached to plaintiff's complaint indicate that the ad-seg hearing began at or around 3:20 p.m. - 3:30 p.m.[34] The "officer assistance" call was made at around 3:29 p.m.[35]

Plaintiff contends that during the scuffle, Cpl. Reta Mays ("Mays") attempted to secure his head by twice applying pressure to his "R-Axis."  He contends that C.O. Adams ("Adams") applied a "straight arm bar and held it" until plaintiff was handcuffed; C.O. [Mark] Richards

---

[32] Dkt.# 1 at 2.

[33] Dkt.# 1 at 12 – 13.

[34] Dkt.# 1-2 at 5, 6, 12, and Dkt.# 1-3 at 1.

[35] Dkt.# 1-2 at 9, 11, 14, and 19.

("Richards") "figure foured" his legs and applied pressure to his left ankle until "Counselor Jason [Hutson]" ("Hutson") and Richards applied leg restraints; but Richards continued to "crank, twist and apply pressure" to his ankle even after it was restrained, "untill [sic] it nearly dislocated," in order to "inflict pain." Plaintiff avers that Hutson and C.O. Fredericks ("Fredericks") had control of his wrist and hands and Elder "had a hold of" his left arm. Once he was restrained, he contends that "the beating started to get worse." He contends he felt his wrist and arm dislocate and his ankle twisted to the point of dislocation. He screamed for mercy and told Stewart "what are you doing?" and "I'm not resisting," but that Stewart said "fuck you punk . . . It's to [sic] late for that," and sprayed him twice in the face and eyes with OC spray anyway.[36] Plaintiff contends that Stewart then struck him several times in the shoulder and head.[37]

Plaintiff contends that after the initial assault, defendants Adams and Richards led him out of the room, where one C.O. Nicholson[38] began video recording the event. Plaintiff avers that Adams and Richards took him to the recreation yard, bouncing his head, face and body into the walls "for no reason" along the way, while plaintiff was still unable to see from the OC spray.[39]

A review of the medical records attached to the defendants' motion for summary judgment indicate that at 3:45 p.m., a nurse checked plaintiff's ankle and wrist restraints in the hallway outside of the hearing office before he was taken to the recreation yard for

---

[36] Dkt.# 1 at 13 – 14.

[37] Dkt.# 1 at 15.

[38] The transcript from plaintiff's deposition indicates that C.O. Nicholson's first name is Terry. See Dkt.# 200-1, p. 80, lines 8 – 9, and p. 94, lines 5 – 6.

[39] Dkt.# 1 at 15.

decontamination.[40] Once out in the recreation yard, plaintiff asserts he was pushed to the ground and attacked again: Adams and Richards "kicked and stomped" his body and legs, and Mays also kicked him. At some point thereafter, plaintiff avers that "[o]ne of the officers came up from the side," "stomped" him in the head, rendering him unconscious.[41] When he awoke, dizzy, confused and disoriented, he heard Mays speaking; he avers that she bent over him, spit in his face, and said "[h]ow do you like that mother fucker" and "you ain't that tough now are you?"[42]

Plaintiff asserts that he was then led from the "rec yard" to the booking area; *en route,* he passed Administrator George Trent. He alleges that while the video camera was running, Trent told him "I run this jail" and "this can happen every day."

Plaintiff contends he was medically assessed in the booking area by Nurse Melissa Mathess, who found a "raised knot above right elbow" and noted that his leg restraints were too tight, because they were causing indentations around both ankles.[43] She was unable to determine if any abnormalities were present, but did document that plaintiff was complaining of pain in both hands and feet and would need reassessed. Plaintiff was then taken to the shower to wash off the OC spray. He alleges that while there, "the guards" snickered and laughed at him, and C.O. Frederick told him "[i]f your [sic] smart you will just take this one on the chin, and as of right now were [sic] not gonna even write you up . . . However if you go filing paperwork, then so will we" and "we can do this every day and what happened today can happen every day."[44]

---

[40] Dkt.3 114-6 at 68.

[41] Dkt.# 1 at 15.

[42] Dkt.# 1 at 16.

[43] The leg restraints were immediately loosened.

[44] Dkt.# 1 at 17 - 18.

Plaintiff contends that Nurse Melissa Bunner came to booking to reassess his injuries, and found that he had a knot on the left wrist; his left hand was slightly out of alignment with his forearm; there was a small amount of swelling in his left ankle; and his gait favored the left side. She recommended he be taken to the emergency room for evaluation.[45]  Plaintiff was taken to the emergency room around 6:00 pm.  When he returned to the NCRJ, he phoned his mother to insist that she contact the West Virginia State Police "to request an investigation into the beating."

Plaintiff asserts that on May 11, 2012, the day after the initial assault, defendant C.O. Frederick came to his holding cell, placed him in full restraints including a "belly chain," and then took him to the shower alone, stepped on his leg shackle chain, then shoved him face-first to the floor.  He contends that Frederick said "I told you what was going to happen, you stupid mother fucker," "call your mommy now," "file some more grievances," and then in a five-minute attack, repeatedly kicked and stomped plaintiff's chest, ribs, and stomach so hard that plaintiff defecated involuntarily.[46]  He avers that Frederick told him that "Lt. Elder told him to "fuck him up good" and "this is what you get when you fuck with us."  Plaintiff asserts that Frederick promised him he would be written up and get outside charges filed against him.

Plaintiff contends that the injuries he sustained in the May 10 and 11th beatings include constant chest pain that felt like he was having a heart attack; trouble breathing; numerous bruised ribs; no feeling in his left thumb; continuous headaches; severe pain in his back, stomach, and ribs. A summary of his injuries attached to his complaint alleges he suffered "head trauma, concussion, abrasions to side of head, knots swelling, bruising and scarring . . .still has migraine headaches."  He also alleges he suffered "face abrasions swelling, bruising, scar. Neck

---

[45] Dkt.# 1 at 18; Dkt.# 114-6 at 92.

[46] Dkt.# 1 at 20.

injury, stiffness, pain. . . severe ankle trauma <Possible ankle fracture/dislocation>, sprain in ankles, severe swelling, bruising, stiffness, lack of mobility & movement, <possible tendon & legamate [sic] damage>, muscle strain . . . still has serious injury to his ankle, chronic pain . . . stiffness, still has limited mobility and can not [sic] put all his weight on it . . . had to hop around on his other leg for up to 6 months after injuries, has slight limp."[47]  In his deposition, he contends he has sustained permanent injuries to his left wrist and ankle, thumb, ribs, and head.[48]

Plaintiff testified in his September 30, 2014 evidentiary hearing that he knows the defendants are withholding a video of the May 10, 2012 altercation, because defendants Mays, Fredericks and Richards all commented to him about watching it several days later, and another officer told plaintiff that the other COs told him he "had to" see it, because it showed plaintiff "screaming like a banshee.[49] The defendants contend that the video in question has little evidentiary value because there was something wrong with the video camera; it malfunctioned and it doesn't show anything.[50]

Here, as noted *supra*, none of the incident reports attached to plaintiff's complaint support his version of the altercation.  Every person who witnessed the beginning of altercation averred that plaintiff was the aggressor who struck Lt. Elder first while Elder was attempting to open the door of the hearing room, while defendant Stewart was escorting plaintiff out;[51] and

---

[47] Dkt.# 1-1 at 2.

[48] Dkt.# 200-1 at 128.

[49] Dkt.# 194 at 2-3.

[50] Dkt.# 194 at 4.  The *pro se* law clerk assigned to this matter reviewed the video of this incident and confirmed that the defendants' description of the video accurately conveys its content; the video shows nothing more than a few-second long view of the top of a desk.

[51] Dkt.# 1-2 at 1, 5, 6-7, 10, 12 – 13, 17, 18, 19, and Dkt.# 1-3 at 1, 3 – 4.

plaintiff vigorously resisted the many officers who responded to the "officer assistance call."[52] Numerous witnesses saw Elder fall backwards and strike his head on the floor. Each officer present at plaintiff's decontamination in the rec yard after the altercation averred that plaintiff was treated humanely, verbally reassured, walked around, given fresh air, water and paper towels to clear his facial area, and then a shower and clean clothing shortly afterwards.[53] Further, the following morning, at some time before 11:30 a.m., CO Abner averred that while passing through "booking" where plaintiff was celled, plaintiff called to him. When he walked over, plaintiff asked Abner if

> when the FBI came to speak with me about the incedent [sic] with Lt [sic] Elder if I was going to tell the truth[.] I said I would tell exactly what I seen[.] Inmate Hillberry stated you will tell them that he shoved me into the cabinet[.] I stated what I seen was Lt [sic] Elder walk up to you and say something and you punch him. Inmate Hillberry then stated you are nothing but a lying piece of shit like the rest of them and I will get you to [sic][.] I then walked away . . . and returned to my norming duties.

Dkt.# 1-2 at 18.

Moreover, despite the absence of videotape of the May 10, 2012 incidents, the undersigned has been able to assess plaintiff's injuries by other means. The reports from the x-rays at the emergency room indicate that plaintiff had no fractures, "only sprains."[54] Plaintiff implies that the defendants deliberately conspired to prevent him from speaking to the West Virginia State Police for a week after the assault, to conceal the extent of injuries as part of their cover up. He alleges that no pictures were taken until 6 - 7 days later when the WV State Trooper

---

[52] Dkt.# 1-2 at 1, 5, 7, 10, 11, 13, 14, 15 – 16, 17, 19 (" . . .Mr. Hillberry grabbed my left wrist and pulled it under him and I felt that he was going to bite my hand."), and Dkt.# 1-3 at 1 and 4 ("She stated she has seen a lot of inmates have to be controlled by officers and this was one of the worst . . . the inmate was very strong and the officers had a hard time getting his hands behind him to handcuff them.").

[53] Dkt.# 1-2 at 5, 9, 10, 11, 16, and 19.

[54] Dkt.# 114-6 at 69.

finally came to speak to him, when by then, "'the shock and awe' factor"[55] of his injuries was lost, because he had healed "a lot," "but you could still see abrasions to the back of my head, see abrasions to my back where there was boots or whatever."[56]

As a preliminary note, there is no constitutional right to have pictures taken of an injury. <u>See</u> e.g. <u>Boykin v. Curry</u>, 2009 WL 152524 (M.D. Ga. Jan. 20, 2009); <u>Dennison v. O'Fallon</u>, 2007 WL 1593069 (D. Mo. Apr. 11, 2007). However, a video was taken at around 5:49 p.m. on May 10, 2012, approximately two hours and twenty minutes after the altercation outside the hearing room, when plaintiff complained of chest pain and was taken to medical at for an EKG.[57] It shows plaintiff wearing an orange "scrub" top with sleeves that came to an inch or two above his elbows, orange pants with the legs rolled up, exposing his ankles, and sandals with no socks. Plaintiff appears calm and cooperative, with no visible marks, swelling, bruises or abrasions on his nearly clean-shaven head, inconsistent with having recently been "stomped" into unconsciousness. Further, despite his claim of facial and neck injuries, there are no visible facial abrasions, swelling, or bruising. Plaintiff moves his head freely, without any appearance of neck injury, stiffness, or pain. Moreover, despite his claim that he suffered "severe ankle trauma <possible ankle fracture/dislocation>, sprain in ankles, severe swelling, bruising, stiffness, lack of mobility & movement, <possible tendon & legamate [sic] damage>, muscle strain . . . still has serious injury to his ankle, chronic pain . . . stiffness, still has limited mobility and can not [sic] put all his weight on it . . . had to hop around on his other leg for up to 6 months after injuries, has slight limp," the video shows him shackled and handcuffed, calmly walking the full length of

---

[55] Dkt.# 1-1 at 3.

[56] Deposition Transcript, Dkt.# 200-1 at 73.

[57] Dkt.# 114-6 at 68.

a hallway back to his cell with only the wide-based gait of a man wearing shackles, but with no visible limp, let alone any need to "hop" on one leg. While he very well may have been uncomfortable, he does not appear so in the video, nor did he voice any complaint of pain to the COs accompanying him.

Plaintiff's medical records indicate that when examined at 4:35 p.m. on May 10, 2012, he had a golf ball-sized "knot" on the inner aspect of his left wrist, and a "small amount" of swelling in his left ankle, but no bruising or deformities.[58] Said "knot" is not visible in the video, nor are any other obvious bruises or marks of any kind on his body apparent. A subsequent exam at around 5:55 p.m. noted that plaintiff's "thumb is numb[,] [and he reported] left ankle pain d/t foot being twisted[,] ribs hurt[,] trouble breathing at times[,] chest pain on occasion[,] headaches;"[59] "chest pain [at 4:35 p.m.] . . . not there now,"[60] and "shoulder/chest several pink abrasions"[61] and "ankle is bruised and swollen."[62] Nonetheless, in the video, plaintiff appears to move easily without apparent pain or stiffness; he presented his hands for cuffing; they did not appear obviously swollen, bruised, or injured; nor did he complain of pain, either when the cuffs were applied or removed later.

Moreover, plaintiff's medical records indicate that at 12:35 a.m. on May 11, 2012, nine hours after the altercation, a nurse was called to assess him for renewed complaints of chest pain. She arrived to find plaintiff kicking his cell door.[63] She asked him to stop so that the officers

---

[58] Dkt.# 114-6 at 68.

[59] Dkt.# 114-6 at 14.

[60] Dkt.# 114-6 at 13.

[61] Dkt.# 114-6 at 14.

[62] Dkt.# 114-6 at 15.

[63] Dkt.# 114-6 at 69.

could restrain him for the assessment and plaintiff complied. The nurse noted that while plaintiff had bruising on his arms and side,[64] his "[c]hest appears fine."[65] Regardless of whether plaintiff was standing on his left, injured ankle, and kicking his cell door with his right foot, or standing on the right foot and kicking with the left, purportedly injured ankle, either scenario is highly inconsistent with plaintiff's claim that his left ankle was so severely injured that he could not bear weight on it for 6 months. The nurse also documented that other than the report of chest pain, the plaintiff "denies any further complaint."[66]

Further, the defendants also provided a video taken on June 13, 2012, slightly more than one month later,[67] recording a cell extraction, required when plaintiff refused to move from one cell to another; refused to present his arms at the food slot to be cuffed behind him; and repeatedly refused lawful orders to comply. A calculated use of force team was assembled; however, staff was successful at confrontation avoidance, because ultimately, plaintiff passively submitted to restraints, albeit on his own terms. That video shows plaintiff freely using his hands and arms and walking around inside his cell while the use of force team officers was approaching it. Plaintiff eventually willingly lay down on the floor on his stomach with no apparent difficulty, with his toes pointed inward and no complaint of pain. He was then cuffed and shackled. Although he cursed at the officers several times as they cuffed him, once assisted to his feet, he walked freely and easily with no visible impairment or further complaint. He displayed no need to "hop" on his right foot to avoid bearing weight on the left one.

---

[64] The nurse does not specify where, on plaintiff's arms, or on which side his bruises appear. No bruises are visible in the video.

[65] Dkt.# 114-6 at 69.

[66] Dkt.# 114-6 at 69.

[67] The video was reviewed by the *pro se* law clerk assigned to this case.

Finally, the undersigned finds no evidence in the record to support plaintiff's claim that he was assaulted and stomped in the shower the following day, other than a West Virginia Inmate Sick Call Non-Emergency Request, filled out by plaintiff on May 13, 2012, *two days after* the alleged assault, claiming he had been beaten on May 11, 2012.[68] Moreover, while plaintiff contends that his injuries from the alleged May 11, 2012 beating were "constant chest pain" that felt like a heart attack, trouble breathing, numerous bruised ribs, no feeling in his left thumb, continuous headaches, and severe pain in his back, stomach and rib area,[69] his medical records indicate that he was already reporting those symptoms from the May 10, 2012 altercation[70] before the May 11, 2012 incident allegedly occurred. Further, plaintiff's description of the May 11, 2012 assault makes no mention of being struck in the head. Finally, other than the May 11, 2012 12:35 a.m. call to his cell for chest pain and the EKG (when plaintiff was kicking his cell door), and a 2:13 p.m. exam later that day by one Dr. Antoine Katiny in follow-up for his "ER visit r/t injury to wrist and ankle during an assistance call 5-10-12,"[71] there is no mention in plaintiff's medical records regarding any allegation of a new assault having occurred that day. The only additional complaint plaintiff made to medical that day was another complaint of chest pain at 3:45 p.m., when another EKG was again performed.

If the May 11, 2012 assault had actually been as "vicious" as plaintiff described, it seems unlikely that plaintiff would not mention it in one of the several opportunities he had to communicate with medical professionals that day, and would instead wait two days to report it and request treatment. Moreover, plaintiff's attached medical records for the time period

---

[68] Dkt.# 1-3 at 6.

[69] Dkt.# 1, ¶119 at 21.

[70] Dkt.# 114-6 at 68 – 69.

[71] Dkt.# 114-6 at 86.

between May 12, 2012 – June 11, 2012 reveal that he repeatedly denied any physical complaints when asked by the inquiring LPN.[72]  After June 13, 2012, the records indicate that his complaints of chest pain became more frequent. However, on June 13, 2012, at 11:06 p.m., the nurse noted that when asked what, if anything, aggravated his chest pain, plaintiff reported "getting pissed" aggravated it, and that "he is pissed and will continue to have chest pain q10 minutes all night."[73] The nurse noted that despite plaintiff's report of chest pain, he had no cardiac symptoms; his respirations were even and unlabored with no shortness of breath; he spoke without difficulty and "is joking w[ith] this nurses states he will see me in 10 minutes."[74]

Here, other than his own unsupported allegations, plaintiff has produced nothing to support this claim. Accordingly, the undersigned agrees with the defendants and finds that the record is completely devoid of any evidence to support plaintiff's allegations that defendants Elder, Stewart, Mays, Richards, Adams, Abner, Frederick and Hutson assaulted him or that additional assaults occurred on May 10 and 11, 2012, by C.O. Frederick and others.  Therefore, the undersigned finds that plaintiff's complaints of excessive force are neither credible nor consistent with the record.  While it is unfortunate that the plaintiff was injured, it appears that the force used was reasonable and was applied in a good faith effort to maintain or restore discipline, and not maliciously or sadistically to cause harm.  Consequently, plaintiff has not only failed to state a claim upon which relief can be granted, but because his claims appear to have been made in bad faith, they should be dismissed as frivolous and malicious as well.

## D. <u>Retaliation</u>

---

[72] Dkt.# 114-6 at 69 – 70.

[73] Dkt.# 114-6 at 18.

[74] Dkt.# 114-6 at 18.

As a preliminary matter, prisoners' claims of bias and retaliation are to be viewed with skepticism. <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir. 1996). Retaliation is usually difficult to prove directly; in most cases it must be inferred from the circumstances surrounding the prisoner's exercise of his constitutional rights and his subsequent punishment. <u>See</u> <u>Benson v. Cady</u>, 761 F.2d 335, 342 (7th Cir. 1985).

In order to sustain a claim based on retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir.1994). Additionally, a plaintiff alleging that a government official retaliated against her in violation of a constitutional right must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. <u>American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 785 (4th Cir. 1993). To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. Causation requires a showing that "but for the retaliatory motive, the complained of incident … would not have occurred." <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir. 1997) (quoting <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied,* 522 U.S. 995 (1997). The inmate must allege more than his personal belief that he is the victim of retaliation. <u>Johnson v. Rodriguez</u>, 110 F.3d at 310. Therefore, *"in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal" to survive a proper motion for dismissal of their claim. <u>See</u> <u>Adams v. Rice</u>, 40 F.3d at 75; <u>Woods v. Smith</u>, 60 F.3d at 1166. "The inmate must produce direct evidence of motivation

or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods v. Smith, 60 F.3d at 1166.

Here, plaintiff alleges that his First and Fourteenth Amendment rights were violated when the defendants retaliated against him for filing grievances over the violation of his rights by the excessive force; his mother's requesting that the West Virginia State Police investigate the assaults; and for his "not letting it go" by choosing to litigate the issue.[75] Plaintiff asserts that the defendants were "caught off guard" by his mother's contacting the State Police so quickly, and did not have time to get "their stories straight." He alleges that subsequently, they conspired amongst themselves to concoct the story that plaintiff shoved Elder first, to "cover up" the excessive force used. He argues that the Doddridge County Prosecutor "seems to agree, and filed a motion to dismiss the charge of assault & battery that Lt. Elder falsely accused the plaintiff of doing."[76] Plaintiff alleges that the defendants threatened that if he did not drop the issue, he could be beaten every day, and he would be charged with an "outside Court assault case for battery on a [sic] officer," both threats which he contends "were carried out." He further contends he was told that if he pursued grievances and litigation, "his life would be miserable when he got to MOCC . . . [because] Trent had all kinds of buddies up there."[77] Plaintiff argues that the all of the harassment, assaults and other actions set forth in the complaint, as well as the defendants' falsifying of documents; lying about him assaulting defendant Elder; placing him in Ad-Seg/QOL once he got transferred to MOCC, are all acts constituting retaliation.

---

[75] Dkt.# 1 at 29.

[76] Dkt.# 1 at 25.

[77] Dkt.# 1 at 29.

A thorough review of the record reveals that plaintiff appears to be a disruptive inmate who has trouble conforming his behavior to WVRJCF expectations. Plaintiff has not established that any of the numerous adverse events he alleges were directly motivated by retaliation, and he fails to produce a chronology of events from which retaliation could be plausibly inferred. See Woods, 60 F.3d at 1166. Moreover, despite the fact that he went ahead and filed grievances and litigated the issue, he has provided no proof, let alone made any allegation that the defendants made good on their alleged threat to beat him "every day," before he was transferred out of NCRJ on August 14, 2014.[78] Merely because plaintiff's administrative remedies had no merit and were justifiably denied;[79] he was criminally charged with attacking an officer; confined to administrative segregation at NCRJ; and then placed in an 18-month Quality of Life program instead of in general population at MOCC, does not prove retaliation. It merely proves that plaintiff is experiencing the reasonable and expected consequences for repeatedly and violently challenging the directives of the WVRJCFA and being a threat to the security of the institution. Accordingly, plaintiff's claim fails to state a retaliation claim upon which relief can be granted and appears to have been made in bad faith, thus it should be dismissed as frivolous and malicious as well.

## E.  Deliberate Indifference to Medical Needs

---

[78] Dkt.# 114-6 at 53.

[79] Defendant John Lopez's May 22, 2012 letter to plaintiff denying his May 15, 16, and 17, 2012 appeals regarding his conditions of confinement states "I have determined that . . . [your claims] are unfounded.  Documentation clearly demonstrates that North Central Regional Jail staff followed our well-established protocols scrupulously and diligently in dealing with violent and aberrant behaviors.  Your actions demonstrate that you are a clear and present danger to staff, inmates, and yourself.  The Administrator is correct in placing you on administrative segregations with all precautionary measures being implemented for the security of the facility."  Dkt.# 18-5 at 1.

In a claim impliedly made against unnamed defendants without asserting an Eighth Amendment violation or providing fact or argument in support,[80] plaintiff also asserts that after the May 11, 2012 assault, he requested medical attention for his new injuries but received none.[81]

To state a cognizable claim for denial of medical care in violation of the Eighth Amendment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. at 105. A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Muncipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).

"[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistence." Id. at 844.

Plaintiff's allegations of deliberate indifference to his medical needs after the alleged May 11, 2012 assault are completely belied by the record, which indicates he never even reported the May 11, 2012 "assault," let alone sought medical care for it, until two days later, on May 13, 2012.[82] Further, as noted *supra,* he received frequent and regular medical care for both

---

[80] Some of plaintiff's attached grievances indicate that he believed an MRI should have been performed, to rule out a torn ligament in his left ankle, because he believed that surgery was indicated. He alleged that "inmates have to suffer" because the WVRJCFA would not pay for such expensive treatment. Dkt.# 1-3 at 19.

[81] Dkt.# 1 at 21; Dkt.# 1-1 at 3.

[82] Dkt.# 1-3 at 6.

his May 10, 2012 injuries as well as his other chronic health needs, both when he requested and when he did not. Each nurse that examined him after the May 10, 2012 altercation documented her exam and findings regarding the tightness of his restraints and apparent injuries;[83] each officer involved in his decontamination documented what was done to relieve plaintiff's discomfort from the OC spray. He received a minimum of two hours of post-OC spray exposure 15-minute checks after the incident.[84] Plaintiff admits, and his records indicate that he was taken to the emergency room at approximately 6:15 p.m. on May 10, 2012 for x-rays to rule out fractures.[85] He was examined at 2:13 pm on May 11, 2012 by Dr. Antoine Katiny in follow-up for his "ER visit r/t injury to wrist and ankle during an assistance call 5-10-12;"[86] there is no mention of plaintiff reporting a new assault having occurred that day. Katiny examined him again on May 14, 2012 for "mulitple c/o chest pain since altercation, 'gone by now;'" on May 21, 2012 for left ankle swelling and pain "after it got twisted by the scuffle . . . old injury and fx [fracture] to the same ankle;" on May 30, 2012, for complaints of numbness in the left thumb, left ankle pain, and dizzy spells with position changes; and on June 22, 2012, for unchanged left ankle pain and some residual numbness in the left thumb that was "getting better in terms of feeling."[87] Plaintiff's medical records indicate that he was already receiving Ibuprofen regularly before the May 10, 2012 incident, and he continued to receive it until May 15, 2012, when it was

---

[83] Dkt.# 1-3 at 5 and 7; Dkt.# 114-6 at 68.

[84] Dkt.# 1-2 at 19.

[85] Dkt.# 114-6 at 69.

[86] Dkt.# 114-6 at 86.

[87] Dkt.# 114-6 at 86 – 87.

discontinued in favor of Naproxen.[88] Dr. Katiny ordered repeat x-rays of plaintiff's ribs, chest, and left ankle, which were done on May 16, 2012.[89] Plaintiff was also seen by registered and licensed practical nurses, on May 10, May 11, May 12, May 13, Jay 16, May 17, May 27, June 6, June 11, June 13, June 14, June 15, June 16, June 18, June 23, June 25, July 13, August 13, and August 14, 2012.[90] Further, his records reveal that each time he reported chest pain, he was immediately assessed and received an EKG; his attached medical records indicate that at least nine EKGs were performed for this reason.[91] His records reveal that he was repeatedly seen in Chronic Care sick calls for a multitude of complaints for several months after the incident.[92] On May 30, 2012, he began receiving regular Accuchecks for diabetes.[93] On May 27, 2012, plaintiff received an eye exam for complaints of blurry vision.[94] On June 25, 2012, he received new glasses.[95] On July 11, 2012, he appeared anxious and was recommended for a psychological/mental health visit.[96] He was seen for that psych exam on July 16, 2012.[97] Finally, in direct contradiction to plaintiff's claim that his medical needs were ignored, not infrequently,

---

[88] Dkt.# 114-6 at 24.

[89] Dkt.# 114-6 at 95.

[90] Dkt.# 114-6 at 10 – 55, 68 – 92.

[91] Dkt.# 114-6 at 93, 94, 96, 107, 108, 109, 110, 111, and 112.

[92] Dkt.# 114-6 at 10 – 34.

[93] Dkt.# 114-6 at 25.

[94] Dkt.# 114-6 at 97.

[95] Dkt.# 114-6 at 71.

[96] Dkt.# 114-6 at 71 and 88.

[97] Dkt.# 114-6 at 89 - 90.

the record indicates plaintiff actually refused prescribed medical treatment, including prescribed pain medication, undermining his claims regarding the amount of pain he had.[98]

Here, plaintiff's medical records simply do not support his claim. Moreover, plaintiff's medical records do not show any serious injury, such as would alert a health care provider to undertake a more thorough examination. "Delay in providing treatment does not violate the Eighth Amendment . . . unless the gravity of the injury is apparent. <u>Cooper v. Dyke</u>, 814 F.2d 941 (4th Cir. 1987). Merely because plaintiff was denied an MRI and surgery does not rise to the level of an Eighth Amendment violation. A disagreement between an inmate and his physician as to what medical care is appropriate does not state a claim for deliberate indifference to medical needs. <u>See</u> <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985). Accordingly, the undersigned finds that plaintiff has not established that any of the named defendants acted with deliberate indifference to his medical needs. Therefore, this claim, as well, fails to state a claim upon which relief can be granted and because it also appears to have been raised in bad faith, it should likewise be dismissed as frivolous and malicious.

## F. <u>Defendant/Counter Claimant Lt. R. Elder's Claims Against Plaintiff</u>

Despite plaintiff's claims that Lt. Elder was not injured in the May 10, 2014 altercation and/or his claim of head injury is suspect because his records indicate he had a preexisting head

---

[98] On June 14, 2012, plaintiff refused Tylenol, Naproxen and his blood pressure medicine, Lisinopril, Dkt.# 114-6 at 98; on June 13, 2012, he refused his blood pressure medicine despite a BP reading of 162/102, Dkt.# 114-6 at 99; on June 14, 2012, he refused a medical assessment and weight (Dkt.# 114-6 at 100); on June 15, 2012, he refused to eat, drink, have a medical assessment, and take his Lisinopril (Dkt.# 114-6 at 101); on June 15, 2012, he refused all care, in order to be sent to the hospital "to get the media involved." Dkt.# 114-6 at 102; on August 15, 2012, he refused a follow-up x-ray, Dkt.# 114-6 at 103; on June 15, 2012, he refused his 1pm assessment, Dkt.# 114-6 at 104; on June 15, 2012, he refused his Tylenol, Lisinopril, food and fluids, Dkt.# 114-6 at 105; on June 15, 2012, he refused his 1pm assessments, food and fluids, Dkt.# 114-6 at 106; on July 24, 2012, he refused an assessment, Dkt.# 114-6 at 113; on July 25, 2012, he refused a 2pm assessment, Dkt.# 114-6 at 114; on July 27, 2012, he refused a 1pm assessment; on August 2, 2012, he refused a 1pm assessment; on August 5, 2012, he refused his prescribed medications, Dkt.# 114-6 at 117; and on August 9, 2014 he refused a 2pm assessment, Dkt.# 114-6 at 118.

injury,[99] Elder's medical records indicate that while he did have a previous history of head injury and concussions before the May 10, 2014 incident, he suffered a new closed head injury/traumatic brain injury when he fell backwards and struck his head on the concrete floor that day. Elder also sprained his left knee in that fall.[100] As a result of the new head injury sustained in the May 10, 2012 melee, he suffered headaches; nausea/vomiting; photophobia; intermittent loss of memory; and by the time he was examined by the West Virginia University Department of Neurology on June 6, 2012, had had two episodes of loss of consciousness as well as two-three episodes of confusion and decreased responsiveness.[101] Further, during one of the seizure episodes, on June 16, 2012, Elder fell off a porch and suffered a partial thickness rotator cuff tear to the left shoulder.[102] Despite efforts to recover from his injuries, he was unable to return to work,[103] and was forced into premature retirement due to medical disability.[104]

Elder avers, and the undersigned agrees, that medical records documenting the full extent of his injuries were produced to plaintiff before he filed his motion to dismiss, and plaintiff "cherry-picked" only the records favorable to him to support his motion to dismiss, thus, plaintiff's dispositive motion was based on false statements and misrepresented facts and

---

[99] The undersigned notes that it is ironic that the plaintiff is accusing Elder of claiming new injury when he had a preexisting injury to the same body part. Plaintiff's own records after the May 10, 2012 indicate that he complained of "L ankle swelling and pain after it got twisted by the scuffle . . . old injury and fx [fracture] to the same ankle." Dkt.# 114-6 at 87.

[100] Dkt# 127-4 at 1 – 2; Dkt.# 152-2.

[101] Dkt.# 127-4 at 2.

[102] Dkt.# 152 at 2 – 3, Dkt.# 152-3, Dkt.# 152-4, and Dkt.# 152-6 at 2.

[103] Dkt.# 152-5.

[104] Elder's 2013 medical records indicate that he was 55 years old at the time of treatment. Dkt.# 152-6 at 1 and Dkt.# 152-7.

evidence. Because of plaintiff's claims made in bad faith, Elder requests that plaintiff be required to pay all attorneys' fees in connection with his responding to plaintiff's dispositive motion.

Supplemental jurisdiction over Lt. Elder's West Virginia state law counterclaims against plaintiff is proper under 28 U.S.C. §1367, because Elder's counterclaims arise out of the "same case or controversy under Article III of the United States Constitution."[105]

## 1) <u>Tort of Outrage/Intentional Infliction of Emotional Distress</u>

In order to prove the tort of outrage, the West Virginia Supreme Court has held:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Travis v. Alcon Laboratories, Inc., 504 S.E.2d 419, Syl. Pt. 3 (W.Va. 1998).

Here, it is apparent from a thorough review of the record that Hillberry did punch and shove Elder, knocking him to the floor. All witnesses to the altercation support Elder's claim that it was Hillberry who shoved Elder while Elder was trying to open the door, and not the other way around, as plaintiff argues. Hillberry's shoving Elder appears to have been an impulsive, opportunistic act, made in anger in the heat of the moment, when Hillberry passed Elder while be escorted from the aborted ad-seg hearing. An impulsive act as occurred here does not meet the standards for the tort of outrage. Accordingly, the undersigned recommends that Elder's counterclaim for the tort of outrage/intentional infliction of emotional distress be dismissed.

## 2) <u>Battery</u>

---

[105] 28 U.S.C. §1367(a).

West Virginia Code §61-2-10b states in pertinent part that

(a) For purposes of this section:

(1) "Government representative" means any officer or employee of the state or a political subdivision thereof, or a person under contract with a state agency or political subdivision thereof.

(d) *Battery*. -- Any person who unlawfully, knowingly and intentionally makes physical contact of an insulting or provoking nature with a government representative . . . acting in his or her official capacity, or unlawfully and intentionally causes physical harm to that person acting in such capacity, is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500 or confined in jail not less than one month nor more than twelve months or both fined and confined.

The record clearly supports that Hillberry unlawfully, knowingly and intentionally made physical contact of an insulting or provoking nature with Lt. Elder, who was acting in his capacity as a Lieutenant in the WVRJCFA, causing serious physical harm to Elder. Accordingly, Elder's counterclaim in this regard should proceed.

**3) Assault**

West Virginia Code §61-2-10b states

**(e) *Assault*.** -- Any person who unlawfully attempts to commit a violent injury to the person of a government representative . . . acting in his or her official capacity, or unlawfully commits an act which places that person acting in his or her official capacity in reasonable apprehension of immediately receiving a violent injury, is guilty of a misdemeanor and, upon conviction thereof, shall be confined in jail for not less than twenty-four hours nor more than six months, fined not more than $200, or both fined and confined.

Here, it is clear from the record that there is no question but that Hillberry did unlawfully assault Elder while Elder was acting in his official capacity as a Lieutenant in the in the WVRJCFA.

Accordingly, Elder's counterclaim against Hillberry should proceed.

**V. Recommendation**

45

For the reasons stated, the undersigned recommends that the Defendants' First Motion for Summary Judgment (Dkt.# 114) be **GRANTED**; Plaintiff's Motion Seeking Sanctions Against Defendants for Failure to Answer or Respond in Compliance with Court Ordered Production of Documents (Dkt.# 138) be **DENIED**; Plaintiff's Motion to Dismiss Defendant Elder's Counter Claim (Dkt.# 142) be **DENIED**; Counter-Claimant R. Elder's Counter Claim against Plaintiff Roy Hillberry (Dkt.# 77) be **GRANTED in part;** Plaintiff's Motion to Compel for Production of Deposition Transcript (Dkt.# 197) be **DENIED as moot;** and that the Plaintiff's complaint be **DISMISSED WITH PREJUDICE against all defendants for failure to state a claim upon which relief can be granted, as frivolous and malicious.**

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by December 31, 2014**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to all counsel of record, via electronic means.

DATED:  December 17, 2014

/s/  James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE